UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ARTHULA MILLER,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )    No. 1:22-cv-01240-JPH-TAB
                                         )
MAKENZIE HACKER,                         )
M. PAGE-CALDWELL,                        )
GEO GROUP, INC.,                         )
                                         )
                    Defendants.          )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MEKESHA PAGE-CALDWELL AND GEO GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Arthula Miller, an inmate incarcerated at New Castle Correctional Facility ("New Castle"), alleges in his amended complaint that Defendants, Makenzie Hacker, Mekesha Page-Caldwell, and GEO Group, Inc. ("GEO") violated his First Amendment rights by firing him for complaining about prison conditions. Dkt. 47. Pending before the Court is Ms. Page-Caldwell and GEO's motion for summary judgment. Dkt. 121. For the reasons explained below, that motion is **granted** as to GEO and **denied** as to Ms. Page-Caldwell.

**I.**
**Procedural History**

Mr. Miller began this action as a pro se litigant by filing a complaint on June 17, 2022. Dkt. 1. The Court screened Mr. Miller's complaint and allowed First Amendment claims to proceed against Ms. Hacker but dismissed Mr. Miller's claims against Ms. Page-Caldwell and GEO. Dkt. 7.

1

On March 13, 2024, Mr. Miller filed an amended complaint, dkt. 47. The Court screened Mr. Miller's amended complaint, allowing First Amendment retaliation claims to proceed against Ms. Page-Caldwell and GEO, as well as the claims that were previously allowed to proceed against Ms. Hacker. Dkt. 77; dkt. 7.

While Mr. Miller's motion to file an amended complaint was pending but before it was screened, Ms. Hacker filed a motion for summary judgment. Dkt. 59; dkt. 60. On March 3, 2025, the Court denied Ms. Hacker's motion for summary judgment, stating that Mr. Miller's claims against Ms. Hacker will be "resolved by settlement or trial." Dkt. 76 at 12.

The Court recruited counsel for Mr. Miller and the parties submitted a Case Management Plan, which the Court approved. Dkt. 98. The CMP explained that the Court had already denied cross motions for summary judgment filed by Mr. Miller and Ms. Hacker, and that Ms. Page-Caldwell and GEO anticipated filing a motion for summary judgment. Dkt. 98 at 4. The Plan did not discuss that Ms. Hacker anticipated filing another motion for summary judgment or grant her leave to file such a motion.

Ms. Hacker, Ms. Page-Caldwell, and GEO have filed a motion for summary judgment. Dkt. 121; dkt. 122. Ms. Hacker does not argue the Court should reconsider its previous ruling under Federal Rule of Civil Procedure 54(b) and does not seek leave to file another motion for summary judgment. Because the Court previously denied Ms. Hacker's motion for summary judgment and ordered that Mr. Miller's claims against her must be resolved through settlement or trial,

2

dkt. 76 at 12, the Court will review Defendants' motion only as it pertains to Mr. Miller's claims against Ms. Page-Caldwell and GEO. *See Narducci v. Moore*, 572 F.3d 313, 324–25 (7th Cir. 2009) ("[T]he filing of successive summary judgment motions is a matter within the discretion of the district court.").

## II.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

**III.**
**Factual Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Miller and draws all reasonable inferences his favor. *Khungar*, 985 F.3d at 572–73. All facts are undisputed unless noted.

**A. The Parties**

Mr. Miller worked as a pod representative at New Castle from November 29, 2016, until he was fired on February 8, 2022, earning $50.00 per month. Dkt. 131-1 ¶¶ 4–5 (Miller Decl.).

GEO operates New Castle, including implementing policies that employees must follow. Dkt. 131-2 at 14:14–15:14 (Page-Caldwell Dep.). GEO has a contract with the Indiana Department of Correction to operate New Castle.

At all times relevant to the events in this lawsuit, Ms. Hacker was a case manager in Mr. Miller's pod and supervised pod representatives, including Mr. Miller. Dkt. 131-4 at 54:8-11, 37:4-10 (Hacker Moody Dep.).

Ms. Page-Caldwell was a GEO employee who worked as a unit team manager in Mr. Miller's pod during the relevant time, where she supervised case

4

managers, including Ms. Hacker. Dkt. 131-2 at 18:2-7, 87:20-23. Ms. Page-Caldwell was responsible for reviewing and ultimately approving case managers' recommendations related to pod representatives' employment. *Id.* at 42:7–43:3. Once a case manager completed an evaluation recommending removal from a job, Ms. Page-Caldwell reviewed the recommendation and supporting paperwork and finalized the decision. *Id.*

### B. Mr. Miller's Role as a Pod Representative

As a pod representative, Mr. Miller's duties included "bring[ing] problems, ideas, and suggestions to the Executive Staff." Dkt. 131-3 at 23 (Pod Representative Job Description). Pod representatives were expected to communicate job-related concerns, housing problems, and safety issues to the assigned case manager. Dkt. 131-2 at 50:24–51:6, 55:25–56:10; dkt. 131-4 at 46:13–50:17.

Mr. Miller consistently received positive or above-average evaluations as a pod representative. *See* dkt. 131-4 at 162–174 (Miller Evaluations). He was rated "[e]xemplary," "[h]elpful," "[p]ositive," "[s]table," "[c]onscientious," and "[o]utstanding," noted as having "[e]xcellent output" and being "[s]afety-conscious," and identified as requiring only "[m]inimal" supervision. *Id.* Inmates in Mr. Miller's pod also testified that he was a reliable and professional worker who was polite and courteous to everyone. *See* dkts. 131-5–7 (Witness Decls.).

The only negative evaluation in the record is from Ms. Hacker on February 8, 2022, where she recommended removing Mr. Miller from the job. *See* dkt. 131-4 at 160.

5

**C. Mr. Miller's Complaint About Facility Conditions and Ms. Hacker's Negative Evaluation**

On February 1, 2022, Mr. Miller raised concerns about problems in the pod as part of his pod representative duties, including fights between inmates and attempts by other inmates to undermine his role as a pod representative. Dkt. 131-1 ¶ 9. Mr. Miller spoke with Ms. Hacker about these issues in her office. *Id.* During the conversation, Ms. Page-Caldwell entered Ms. Hacker's office and Mr. Miller raised the same concerns directly to her. *Id.*

One week later, Ms. Hacker negatively evaluated Mr. Miller, saying that he "fail[s] to meet facility standards." Dkt. 131-4 at 160. The evaluation rated Mr. Miller as "[r]esentful," "[e]asily-led," "[d]isruptive," "[v]olatile," "[s]loppy," "[l]azy," "[c]areless," and needing "[c]onstant" supervision. *Id.* Ms. Hacker testified that during the relevant time, "Offender Miller was unprofessional and unable to control his aggressive outbursts with both staff and other incarcerated individuals, causing disruptions with the safety and security of the facility's daily operations." Dkt. 123-3 ¶ 16 (Hacker Decl.). She also stated that Mr. Miller posed a threat to her because he seemed to make mistakes on purpose so that he could spend time in her office. *Id.*

**D. Mr. Miller's Termination**

Ms. Hacker testified that she discussed her recommendation to terminate Mr. Miller with Ms. Page-Caldwell, who agreed with the recommendation. Dkt. 131-4 at 119:23–121:14. Ms. Page-Caldwell testified that she did not remember Mr. Miller or his termination. Dkt. 131-2 at 84:21-24. She also testified that she routinely approved case managers' recommendations unless something was

6

"off." *Id.* at 43:16–43:3. The warden is the ultimate decision-maker in termination decisions, but the warden never overturned one of Ms. Page-Caldwell's recommendations to terminate a worker. *Id.* at 43:4-23.

Mr. Miller was fired from his pod representative position on February 8, 2022, the same day that Ms. Hacker submitted the negative evaluation. Dkt. 131-1 ¶¶ 10, 12. The following day, Ms. Hacker called Paul Woodcox, another New Castle inmate, to her office. Dkt. 131-8 at 2. Mr. Woodcox testified that Ms. Hacker told him that she fired Mr. Miller because she was "tired of him complaining." *Id.*

### D. Other Inmates' Terminations from Jobs at New Castle

Mr. Miller designates evidence that two other New Castle inmates have been denied job opportunities after complaining about prison conditions. In 2015, New Castle inmate John Harstock was removed from his position as a custodian when he began to petition for safer working conditions, such as proper protective equipment to clean the showers. Dkt. 131-9 at 2–7 (Harstock Aff.). New Castle staff referenced Mr. Harstock's complaints as the reason for changing his job. *Id.* at 7. In December 2021, New Castle inmate Carlton Wright filed a grievance complaining that he was denied a job opportunity because he kept filing grievances. Dkt. 131-4 at 175–179. Mr. Wright wrote that Ms. Hacker told him that she would not give him a job because he "constantly just keep[s] on filing grievances." *Id.* at 179.

# IV.
## Discussion

To survive summary judgment on a First Amendment retaliation claim, a plaintiff must first designate "evidence sufficient to allow a reasonable jury to conclude [that he] engaged in protected First Amendment activity, he suffered a deprivation that would likely deter future First Amendment activity, and the First Amendment activity was a motivating factor in the defendant's decision to take the retaliatory action." *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023).

### A. Ms. Page-Caldwell

Defendants first argue that Ms. Page-Caldwell was not personally involved in terminating Mr. Miller. Dkt. 122 at 9. Personal involvement in a § 1983 lawsuit "depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Here, the record allows a reasonable jury to infer that Ms. Page-Caldwell was personally involved in terminating Mr. Miller's employment.

First, a reasonable jury could infer that Ms. Page-Caldwell directly heard Mr. Miller's complaint on February 1, 2022, which demonstrates knowledge of the First Amendment activity.[1] Ms. Page-Caldwell also testified that, although she did not remember reviewing Mr. Miller's termination, her process was to review case managers' recommendations and then generally approve them. Furthermore, Ms. Hacker testified that she discussed Mr. Miller's evaluation and her recommendation with Ms. Page-Caldwell, who ultimately approved the decision to terminate Mr. Miller.

That designated evidence allows a reasonable jury to infer Ms. Page-Caldwell's knowledge of Mr. Miller's complaint and her approval of his termination a week after the complaint. This is sufficient to show an issue of fact for the jury on personal involvement. *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015).

### 1.    Protected First Amendment Activity

Defendants argue that Mr. Miller's complaint was not protected speech because it was not "legitimate." Dkt. 122 at 9. Mr. Miller responds that a "reasonable jury could easily conclude that Mr. Miller's complaints were consistent with legitimate penological interests and therefore protected." Dkt. 130 at 17.

---

[1] While there is a dispute of fact over whether this interaction occurred, because Ms. Page-Caldwell testified that she did not remember Mr. Miller, that is for the jury to decide and at summary judgment the Court must draw all reasonable inferences from evidence in Mr. Miller's favor.

Mr. Miller's speech was protected if "he engaged in this speech in a manner consistent with legitimate penological interests." *Watkins v. Kasper*, 599 F.3d 791, 796 (7th Cir. 2010). "The prison setting is distinctive, and it affects many constitutional rights." *Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023). An inmate's speech is not protected if it is disruptive or confrontational; for example, "back talk" is not protected speech. *Id.* (citing *Watkins*, 599 F.3d at 798, 799; *Kervin v. Barnes*, 787 F.3d 833, 835 (7th Cir. 2015)). "But unlike public employee speech, inmate speech 'can be protected even when it does not involve a matter of public concern.'" *Id.* (quoting *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009)). In *Whitfield*, the Seventh Circuit determined that the refusal to sign release paperwork was a protected activity because it did not "threaten[ ] the penological setting." *Id.* at 709 (comparing situation with *Garner v. Brown*, 752 F. App'x 354, 357 (7th Cir. 2018), where prison officials could forbid group petitions because such petitions could cause riots, disrespect, and violent confrontations).

The designated evidence does not establish that Mr. Miller's complaint about prison conditions on February 1, 2022, was disruptive or confrontational. Moreover, the designated evidence shows that Mr. Miller's complaints were within the scope of his employment as a pod representative, which includes raising concerns to Executive Staff. *See Bridges*, 557 F.3d at 548 ("Legitimate penological objectives include crime deterrence, prisoner rehabilitation, and internal prison security.") (citing *Pell v. Procunier*, 417 U.S. 817, 822 – 23 (1974).

10

A reasonable jury could therefore conclude that Mr. Miller's complaint to Ms. Hacker and Ms. Page-Caldwell was protected by the First Amendment.

### 2.    Deprivation Likely to Deter Future First Amendment Activity

Defendants argue that Mr. Miller cannot show that his termination is likely to deter future First Amendment activity because no one is entitled to a prison job. Dkt. 122 at 9. Mr. Miller responds that losing a prison job can deter First Amendment activity under Seventh Circuit precedent. Dkt. 130 at 18.

Whether allegedly retaliatory conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test, *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020). While no inmate is entitled to a prison job, the Seventh Circuit has found that denial of a prison job could deter First Amendment activity. *See Douglas*, 964 F.3d at 648 ("The denial of a prison job that would impart such palpable benefits could certainly deter First Amendment activity."). This is because prison jobs can be scarce, with limited wages, and employment carries significant institutional benefits. *See id.* Here, Mr. Miller lost his job that he had successfully held for more than five years, and $50.00 a month in pay, which is substantial for an inmate like Mr. Miller. *See* dkt. 131-4 at 162–174.

### 3.    Motivating Factor

Defendants argue that Mr. Miller has not shown that Ms. Page-Caldwell had anything to do with Ms. Hacker's performance evaluation or his termination.

11

Dkt. 122 at 10. Mr. Miller responds that Ms. Page-Caldwell approved Ms. Hacker's termination recommendation "closely on the heels" of his protected activity. Dkt. 130 at 20–21.

"The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *See id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013). To show that a decision is pretextual, a plaintiff must show that the decisionmaker did not believe the proffered explanation—that it is a lie, rather than a mistake. *Consolino v. Dart*, 120 F.4th 1324, 1327 (7th Cir. 2024).

Ms. Page-Caldwell decided to terminate Mr. Miller one week after she heard his complaints and talked with Ms. Hacker about Mr. Miller. Under Seventh Circuit precedent, such close proximity between the protected speech and the deprivation is enough for a reasonable jury to infer that the defendant was motivated by the protected speech. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct.'") (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785,

790 (7th Cir. 2001)); *see also Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("The closer two events are, the more likely that the first caused the second").

While Ms. Page-Caldwell's decision to terminate Mr. Miller came shortly after his protected activity, Defendants have not designated evidence of intervening events leading to Mr. Miller's termination. *See Kidwell*, 679 F.3d at 967 (explaining that "a significant intervening event" can undermine a suspicious-timing argument). Instead, Defendants argue that Mr. Miller's termination would have occurred anyway because of his poor work performance. Dkt. 122 at 10. As explained in the first summary judgment order, however, there is a dispute of material fact as to whether Mr. Miller would have been terminated even if he had not complained to Ms. Hacker and Ms. Page-Caldwell on February 1. Dkt. 76 at 11. There is a triable issue of fact on this issue that must be resolved by a jury in connection with making witness credibility determinations.

Furthermore, Mr. Miller has designated evidence allowing a reasonable jury to determine that the negative evaluation was pretextual. Ms. Page-Caldwell chose to approve Ms. Hacker's recommendation despite Mr. Miller's years of positive evaluations and a lack of a disciplinary record or documentation showing any of the described misconduct. Given testimony that Ms. Page-Caldwell listened to Mr. Miller's complaint and discussed the decision to terminate Mr. Miller with Ms. Hacker, a reasonable jury could conclude that Ms. Page-Caldwell's proffered explanation was not just a mistake caused by her

13

routine approval of case managers' recommendations, but was pretextual. *See Consolino*, 120 F.4th at 1327.

Summary judgment is therefore **denied** as to Ms. Page-Caldwell.

### B. GEO

Private corporations acting under color of state law, such as GEO, are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took 'deliberate' action that was the 'moving force' behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (quoting *Bd. of County Comm'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 403–07 (1997)).

*Monell* liability attaches in two limited circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, a *Monell* plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* (internal quotation marks omitted). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* (internal quotation marks omitted).

14

Under this theory, a plaintiff "must typically point to evidence of 'a prior pattern of similar constitutional violations.'" *Id.* (quoting *J.K.J v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020)). This requirement ensures that "'there is a true municipal policy at issue, not a random event.'" *Id.* (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)).

Here, Defendants argue that Mr. Miller has not designated sufficient evidence that GEO had a widespread custom or practice of firing employees for complaining about prison conditions. Dkt. 122 at 12–14. Mr. Miller responds that his experience and the experiences of Mr. Wright and Mr. Harstock demonstrate a widespread practice. Dkt. 130 at 24–25.

To show a widespread practice, a plaintiff needs to designate evidence that there is a true municipal or corporate policy at issue and not just a random event. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (citing *Grieveson v. Anderson*, 538 F.3d. 763, 774 (7th Cir. 2008)). The Seventh Circuit has not adopted bright-line rules for defining a widespread custom or practice. *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020); *see also Howell*, 987 F.3d at 654 ("In our extensive case law on prison healthcare, we have not adopted bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*."). However, Seventh Circuit case law has generally required more than three similar incidents to constitute a widespread practice or custom. *Hildreth*, 960 F.3d at 427 (collecting cases).

In this case, a jury could not conclude that GEO had a widespread policy of firing people for complaining about prison conditions. The first incident in the record occurred in 2015, more than seven years before Mr. Miller was fired and six years before Mr. Wright filed a grievance complaining that Ms. Hacker refused to hire him for complaining. The distance in time undercuts any inference that what happened to Mr. Harstock in 2015 was "widespread" or part of a series of similar acts happening to Mr. Miller in 2022. *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (explaining that for *Monell* liability to attach, "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference"). That leaves the Court with two incidents: Mr. Wright's 2021 complaint and Mr. Miller's 2022 termination. These two acts also do not suffice to show a widespread practice. They both involve the same allegedly bad actor—Ms. Hacker—so they do not support an inference that GEO policy is responsible rather one person's decisions. Moreover, while there is no bright-line rule, two incidents do not generally suffice to show a widespread practice absent other factors. *See, e.g., Emerson v. Centurion Health of Indiana, LLC*, 2025 WL 2432158, at *7 (S.D. Ind. Aug. 22, 2025) (finding a widespread practice of missing prescription doses under *Monell* where the plaintiff produced two affidavits from other inmates claiming that they also missed doses *and* the plaintiff had documented that he missed his medications 63 days out of a 28-month period).

In sum, from the designated evidence, a reasonable jury could not conclude that GEO had a widespread practice of firing inmates in retaliation for

16

complaining about prison conditions. Summary judgment is therefore **granted** for GEO.

## V.
## Conclusion

For the above reasons, the Court **grants** Defendants' motion for summary judgment, dkt. [121], for GEO and **denies** the motion for Ms. Page-Caldwell. Mr. Miller's First Amendment claims against Ms. Page-Caldwell and Ms. Hacker shall be resolved by trial or settlement.

No partial final judgment shall issue.

**SO ORDERED.**

Date: 6/29/2026

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All ECF-Registered Attorneys of Record

17